# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| PINEY WOODS RESOURCES, INC., *et al.*,[1] | Case No. 19-01390-11 (DSC) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(A), 361 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E), (II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)

Piney Woods Resources, Inc. ("Piney Woods") and its affiliated debtor, each as a debtor and debtor in possession (collectively with Piney Woods, the "Debtors") in the above-captioned cases (the "Cases") before the United States Bankruptcy Court for the Northern District of Alabama (the "Court"), respectfully state the following in support of this motion for entry of interim and final orders (i) authorizing postpetition secured financing pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (ii) authorizing the Debtors' use of cash collateral pursuant to 11 U.S.C. § 363, (iii) granting adequate protection pursuant to 11 U.S.C. §§ 361, 363 and 364, and (iv) scheduling a final hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c) ("DIP Motion"). In support of this DIP Motion, the Debtors respectfully proffer the First Day Declaration of B. Scott Spears, Chief Executive Officer of Debtor Piney Woods filed ("Spears Declaration") contemporaneously herewith. In further support of this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Piney Woods Resources, Inc. (0129) and Jesse Creek Mining, LLC (0533). The location of the Debtors' service address is: 1615 Kent Dairy Road, Alabaster, Alabama 35007. Debtors have filed a motion for joint administration with the Court.

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 1 of 32

Motion, the Debtors respectfully state the following:

## **Relief Requested**

1.       The Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order") to:

a.   authorize the Debtors to obtain postpetition financing (the "DIP Facility"), consisting of a superpriority priming multiple-draw term loan credit facility in the aggregate amount of $2,583,000, which includes, (i) the aggregate principal amount of up to $2,283,000 in respect of new money term loan commitments (the "New Money DIP Loans"), of which the aggregate principal amount of not more than $1,000,000 will be available to the Debtors on an interim basis upon the entry of the Interim Order in one or more draws in accordance with the Budget (as defined herein) (the Interim Order and the DIP Loans approved herein, the "Interim DIP Facility") and (ii) a roll-up of $300,000 (the "Roll-Up Loans") advanced in March 2019 under that certain prepetition Bridge Loan, dated March 22, 2018 (as amended, restated, supplemented, or otherwise modified through the Commencement Date (defined below), the "Bridge Loan Agreement"), which will be available to the Debtors' on an interim basis in the amount of $150,000 (together with the New Money DIP Loans, the "DIP Loans" and all DIP Loans approved pursuant to the Final Order constituting the "Final DIP Facility"), subject to the terms and conditions of the Interim Order and Final Order, and as set forth in the DIP Documents (as defined below).

b.   authorize the Debtors to enter into that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement between the Debtors and Resource Capital Fund VI L.P. (the "DIP Lender") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents"), which shall be in substantially the same form attached hereto as **Exhibit C**[2], and to perform such other and further acts as may be required in connection with the DIP Documents;

c.   authorize the Debtors to use the DIP Loans, the proceeds thereof, and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), pursuant to the Budget (as defined below), to provide working capital for, and for other general corporate purposes of, the Debtors;

---

[2]       Schedules to the DIP Credit Agreement will be made available at the Interim Hearing.

d. authorize the Debtors to use the Prepetition Collateral (as defined below), including Cash Collateral, in which the Prepetition Secured Parties have an interest on a consensual basis;

e. grant valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in all prepetition and postpetition property and assets of the Debtors, except as otherwise provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Commencement Date, including, upon entry of the Final Order), subject only to the Carve-Out (as defined below), the Post-Termination Wage Funding Amount (as defined in the Interim Order), and, if any, the Permitted Liens (as defined below) on the terms and conditions set forth herein and in the DIP Documents;

f. grant superpriority administrative expense claims against each of the Debtors' estates to the DIP Lender with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve-Out on the terms and conditions set forth herein and in the DIP Documents;

g. limit the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Commencement Date);

h. hold, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the DIP Motion before this Court to consider entry of the Interim Order, among other things, (1) authorizing Debtors, on an interim basis, to borrow from the DIP Lender under the DIP Documents up to an aggregate principal amount not to exceed $1,150,000 in DIP Loans (subject to any limitations of borrowing under the DIP Documents), (2) authorizing the Debtors' use of Cash Collateral, and (3) granting the adequate protection described in the Interim Order;

i. schedule a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing, among other things, Debtors, on a final basis, to borrow from the DIP Lender under the DIP Documents up to an aggregate principal amount of than $2,583,000 in DIP Loans (which includes the $1,150,000 approved hereunder), of which up to $2,283,000 shall consist of New Money DIP Loans and $300,000 shall consist of the Roll-Up Loan, and the continued use of Cash Collateral, as set forth in the DIP Motion and the DIP Documents filed with the Court; and

j. provide for the immediate effectiveness of the Interim Order and waive any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B):[3]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Piney Woods Resources, Inc. and Jesse Creek Mining, LLC<br><br>*See* DIP Credit Agreement §1.01 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | None |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Resource Capital Fund VI L.P.<br><br>*See* DIP Credit Agreement §1.01 |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Resource Capital Fund V L.P., RCF V Annex Fund L.P., and Resource Capital Fund VI L.P.<br>*See* DIP Interim Order, §6(a) |
| **Effect of Interim Order on Third Parties** | Nothing in this Interim Order shall affect the rights of a appointed committee pursuant to Bankruptcy Code section 328 or 1103 to pursue and retain any funds recovered as a result of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "<u>Avoidance Actions</u>") or constitute a waiver or rights or claims by any third party. Such relief may be requested as part of the Final Order.<br><br>DIP Interim Order § 2 |
| **Term**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The earliest of (i) the date that is ninety (90) days following the first Business Day after entry of the Interim Order, (ii) the earlier of (x) the date upon which the Interim Order expires or (y) twenty five (25) days (which may be extended by up to two (2) additional Business Days to accommodate the Bankruptcy Court's calendar and availability) after the date the Interim Order is entered, in either case, if the Final Order has not been entered prior to the expiration of such period, (iii) the conversion of the Chapter 11 Cases into liquidation proceedings under chapter 7 of the Bankruptcy Code, (iv) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code and (v) the date of the acceleration of the Loans and termination of the New Money DIP Commitments hereunder.<br><br>*See* DIP Credit Agreement §1.01 ("Final Maturity Date" and "Maturity Date") |

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

4828-1419-4576

4

| | |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | (i) Under the Interim Order, a combined principal amount of $1,000,000, with the first advance of $700,000 provided upon entry of the Interim Order and the second advance of $300,000 provided on or after April 10, 2019, with an Initial Roll Up DIP Loan in the aggregate principal amount of $150,000 to be deemed drawn on the Closing Date; and (ii) upon entry of the Final Order, an Additional New Money DIP Loan in the aggregate principal amount of $1,283,000, and an Additional Roll Up DIP Loan in the aggregate principal amount of $150,000, each of which will be available to be drawn or be deemed drawn after entry of the Final DIP Order. The total Commitment for the New Money DIP Loan is $2,283,000.<br><br>*See* DIP Credit Agreement §2.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The obligations of Lender to make the Loans is subject to the satisfaction or waiver of the conditions precedent outlined in Sections 4.01 and 4.02 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement §§4.01, 4.02 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest shall accrue and be added and capitalized to the outstanding principal balance of the Loans on the last Business Day of each month, commencing with the month ending April1, 2019. The Loans shall bear interest on the outstanding principal amount, accruing on a simple basis, in kind by being capitalized and added to the principal amount of the Loans at a rate per annum equal to 8.00%.<br><br>Upon the occurrence and during the continuance of an Event of Default, the Debtors shall pay interest on the outstanding Obligations hereunder at a rate per annum equal to 10.0%, which shall be due and payable upon demand.<br><br>*See* DIP Credit Agreement §2.05 |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Credit Agreement, under this Interim Order, and in accordance with the Budget.<br><br>The Debtors are authorized to use Cash Collateral and the proceeds of the DIP Facility in a manner set forth in the Budget.<br><br>None of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve-Out may be used by the Debtors to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type against any of the DIP Lender or the Prepetition Lenders or seeking relief that would impair the rights and remedies of the DIP Lender or the Prepetition Lenders under the DIP Documents, the Prepetition Credit Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors any claim or proceeding of any kind, the purpose of which is to seek, or the result of which would be to obtain relief that would impair the ability of any of the DIP Lender or the Prepetition |

| | Lenders to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Lender or the Prepetition Lenders related to the DIP Obligations, or the Prepetition Obligations. |
|---|---|
| | *See* DIP Interim Order §8(c), 9, 24 |
| **Adequate Protection** Bankruptcy Rule 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations, consents, and releases set forth herein, the Prepetition Secured Parties consent to the Debtors' use of the Prepetition Collateral, the Carve-Out, the Post Termination Wage Funding Amount and the priming liens and security interests granted to the DIP Lender in strict accordance with the terms of the Interim Order in lieu of requiring further adequate protection under the Bankruptcy Code to the extent such use and such grant results in the postpetition diminution in value of such interests, the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code. Such consent shall expire upon the occurrence of a Termination Event (as defined in the Interim Order) or the vacatur or modification of this Interim Order. |
| | *See* DIP Interim Order §15(a) |
| **Grant of Priority Lien** Bankruptcy Rule 4001(c)(1)(B)(ii) | The DIP Lender shall receive a first-priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, including any proceeds thereof (the "Available Assets"), a first priority senior priming security interest in and a lien upon the Available Assets, and junior lien on property the Available Assets that is subject to a lien. |
| | *See* DIP Interim Order § 11 |
| **Determination of Validity** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Debtors are stipulating to the validity and amount of the Prepetition Obligations and Prepetition Liens. |
| | *See* DIP Interim Order § 6 |
| **Modification of Debtor's Right to Request Use of Cash Collateral** Bankruptcy Rule 4001(c)(1)(B) | Until entry of Final Order of denial of relief requested therein, Debtors may not grant a claim equal or superior to the DIP Superpriority Claims, any lien on the DIP Collateral or Prepetition Collateral, any seek or consent to other order allowing the use of DIP Collateral. The DIP Liens and DIP Superpriority Claims shall continued in full force and effect until all DIP Obligations are paid in full. |
| | *See* DIP Interim Order § 23 |
| **Roll-Up of Prepetition Advance** Bankruptcy Rule 4001(c)(1)(B)(ii) | The aggregate commitment of $2,583,000 includes $300,000 of money advanced prior to the Commencement Date in March 2019, $150,000 will be drawn on an interim basis under the Interim Order, and $150,000 will be drawn after entry of the Final Order. |
| | *See* DIP Credit Agreement §2.01 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Debtors shall, jointly and severally, pay, whether accrued or incurred prior to, on or after the Petition Date, (i) all reasonable and documented out-of-pocket expenses (including attorneys' fees and costs,) incurred by the Lender in connection with this Agreement and , the Chapter 11 Cases, |

|  | and (ii) all reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of counsel) of the Lender associated with this Agreement, the transactions contemplated hereby, and the Chapter 11 Cases. Such costs and expenses shall be added and capitalized to the outstanding principal balance of the Loans.<br><br>Debtors shall, jointly and severally, indemnify and defend the Lender and its Related Parties (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses incurred by any Indemnitee or asserted against any Indemnitee arising out of, in connection with, or as a result of the DIP Credit Agreement, any Loan, environmental liability, and claims or litigation; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Notwithstanding anything to the contrary contained in any DIP Documents, any rights to reimbursement or indemnification of the Lender, as an Indemnitee, under any DIP Documents shall only apply to expenses, losses, claims, damages and liabilities incurred or arising out of any such Indemnitee's status as a debt financing provider to the Debtors (and not as an equity holder of Debtor)<br><br>*See* DIP Credit Agreement §9.04(a) and (b) |
|---|---|
| **Release**<br>Bankruptcy Code 4001(c)(1)(B)(vii) | Subject to paragraph 2 of the Interim Order, the Debtors and their estates shall unconditionally and irrevocably release the DIP Lender and Prepetition Lenders.<br><br>*See* DIP Interim Order § 25 |
| **Repayment Features**<br>Bankruptcy Rule 4001(c)(1)(B) | Debtors shall repay to the Lender on the Maturity Date (as defined in the DIP Credit Agreement) the aggregate principal amount payable in accordance with the DIP Documents.<br><br>*See* DIP Credit Agreement §2.04 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br><br>**Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors are authorized to use Cash Collateral and the proceeds of the DIP Facility in a manner set forth in the Budget.<br><br>*See* DIP Interim Order §15(a)<br><br>Each line item in the Budget is subject to a permitted negative variance of (i) 10% per week above the projected aggregate disbursements set forth in the Budget, (ii) 5% per week, on disbursement on a by-line-item basis, and (iii) 5% per four-week period, then ending, on the revenue set forth in the Budget. Any unused amounts in the Budget during any one-week period may be carried forward to future weekly periods and applied to any amount by which that same line-item, and only that same line-item, exceeds its projected use as set forth in the Budget, such that the cumulative-to-date budgeted amount for each line item is available without causing such future weekly periods to exceed the allowable |

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document    Page 7 of 32

| | |
|---|---|
| | variance. Each line item in the Budget is subject to a maximum amount for each particular week, as specified therein.<br><br>*See* DIP Credit Agreement §7.27 |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | As conditions to the Lender's extension of the DIP Loans and the Debtors' use of the Cash Collateral and as further adequate protection to the DIP Lender and Prepetition Secured Parties for the use of Cash Collateral, the Debtors shall conduct a sale process of their assets and business and other conduct these Cases in accordance with the following milestones (as set forth in Schedule 4.02 of the DIP Credit Agreement and restated herein, the "<u>Required Milestones</u>"):<br><br>(i)    No later than 1 day after the Commencement Date, Debtors shall have filed a motion seeking interim and final approval of the DIP Facility;<br><br>(ii)   No later than April 5, 2019, the court shall have entered the interim order approving the DIP Facility;<br><br>(iii)  No later than April 10, 2019, the Debtors shall have filed the Bidding Procedures Motion contemplating the sale of Debtors' mining operations and assets;<br><br>(iv)  No later than April 10, 2019, the Debtors shall have filed a motion to retain a sale consultant;<br><br>(v)   No later than 5 days after the Commencement Date, the Debtors shall provide a report on the reclamation status of Debtors' assets to the DIP Lender, including an assessment of the adequacy of the reclamation bonds and a forecast of the costs to complete reclamation;<br><br>(vi)  No later than April 15, 2019, the Debtors shall provide a report from the Debtors and the sale consultant regarding the feasibility of whether to sell the surface and subsurface mining operations separately or collectively, whether to abandon for reclamation the surface mining operation and reject the associated executory contracts and providing recommendations on the preferred sales alternative;<br><br>(vii) No later than 14 days after filing of the Bidding Procedures Motion, the court shall have entered the Bidding Procedures Order contemplating the sale of the Debtor's assets, which order shall set the Bid Deadline for a date not later than 30 days after entry of the Bidding Procedures Order and the public auction for a date not later than two business days after the Bid Deadline;<br><br>(viii) No later than 25 days after the entry of the interim order, the court shall have entered the final order approving the DIP Facility; |

| | | |
|---|---|---|
| | (ix) | No later than 35 days after entry of the Bidding Procedures Order, the Debtors shall have declared a Successful Bidder and the Court shall have held a hearing on the sale of Debtors' assets to the Successful Bidder; |
| | (x) | No later than 2 business days after the Sale Hearing, the Court shall have entered the Sale Order; and |
| | (xi) | If no bids are submitted by the Bid Deadline or no Successful Bidder is declared, no later than 55 days after the Commencement Date, Debtors shall have filed a motion to abandon for reclamation the Debtors' mining operation and assets or filed a motion to convert the Chapter 11 Cases to Chapter 7. |
| | | Each of the Required Milestones may be extended or waived in writing by the Lender in its sole and absolute discretion or by order of the Bankruptcy Court. The Debtors shall promptly file with the Bankruptcy Court a notice of any such extension or waiver. |
| | | *See* DIP Interim Order §15(a); DIP Credit Agreement §4.02(g) |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement contains customary events of default for similar debtor-in-possession financings of this type and other events of default deemed appropriate for the specific transaction by the Lender. There shall be no case milestones other than as expressly set forth herein.  *See* DIP Credit Agreement §8.01 | |
| **Liens on the Proceeds of Avoidance Actions** 4001(c)(1)(B) | Nothing in this Interim Order shall affect the rights of an appointed committee pursuant to Bankruptcy Code section 328 or 1103 to pursue and retain any funds recovered as a result of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions") or constitute a waiver or rights or claims by any third party. Such relief may be requested as part of the Final Order.  *See* DIP Interim Order §2(b) | |

## Jurisdiction and Venue

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *General Order of Reference* from the United States District Court for the Northern District

of Alabama, dated January 12, 1995. The Debtors confirm their consent, pursuant to rule 7008 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order

by the Court in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

## Introduction

## I.     Debtors' Operations and Prepetition Financing.

5.     Piney Woods and Jesse Creek were formed on June 29, 2012 to produce and develop coal assets and engage in the business of extracting, processing, and marketing metallurgical and industrial coals from underground, surface and highwall mining operations. Jesse Creek is headquartered in Alabaster, Alabama and, at the time of its founding, had operating assets that included one underground mine and one surface and highwall mining operation located approximately 7 miles west of Alabaster, Alabama. Through these two distinct active mining operations, Jesse Creek was able to access qualities of coal with high volatility, low sulfur and low ash characteristics, which allows the Debtors to develop relationships with a diverse customer base, both domestically and internationally. Jesse Creek's traditional customers include coke producers and industrial customers, and the company is uniquely positioned within the coal industry because of its primary focus on metallurgical,[4] rather than thermal coal.

6.     In August 2014, Jesse Creek embarked on a study to determine whether the development of an adjacent coal basin known as the Lolley Basin would be feasible. During the period of August 2014 through February 2017, Jesse Creek completed a scoping study, pre-

---

[4]     Metallurgical or "met coal" refers to the various grades of coal with suitable carbonation properties to make coke in the steelmaking process. This is in contrast to thermal coal, which is used to produce electricity, steam, or both.

feasibility study and full bankable feasibility study in conjunction with its majority owner's technical departmental team.

7. Today, Jesse Creek consists of a mining complex that contains a surface and highwall mining operation ("Murry Creek"), a preparation plant ("PWR Processing"), and an underground mine development project ("Lolley Mine") as a result of the feasibility study. Jesse Creek has been developing the Lolley Mine, a brownfield underground metallurgical project with an expected mine life of approximately 25 years. At full productive capacity the production rate will be approximately 1.5 million tons per year. The Lolley Mine project is approximately 60% complete, but has cost significantly more than expected due to a material, unforeseen geologic zone that was encountered beginning in September 2018. Jesse Creek, therefore, had to change its mining technique to a less productive method while developing the mine access, known as a slope, into the main body of the coal reserves. The main body of the reserves are still believed to be viable once the mine access is complete.

8. Piney Woods is owned approximately (a) 70.8% by private equity funds controlled by Resource Capital Funds ("RCF") and (b) 27.7% by Tacoa Minerals, LLC. In addition to its equity investment, RCF has provided various tranches of senior secured debt to the Debtors to fund the Lolley Mine as well as supplemental expansions of a credit line to the Debtors to fund development.

9. RCF funding ceased around March 20, 2019, and the Debtors were forced to idle mining and development operations on March 27, 2019. All but 28 critical staff were laid off at that time.

10. Prior to idling, the Debtors did not have sufficient cash to pay wages or retain professionals. In order to allow the Debtors enough funding to file these Cases, RCF agreed to

fund $300,000 to the Debtors under the pre-existing credit facilities ("Roll-Up Loans") on March 27, 2019. Without these funds, the Debtors would not have been able to initiate the Cases.

## II.    Commencement of Bankruptcy Proceedings and DIP Financing.

11.    On April 2, 2019 ("Commencement Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

12.    RCF has agreed to provide debtor in possession financing to fund a Chapter 11 sale of the Debtors' assets. RCF and the Debtors believe that one or more parties will be interested in acquiring the high quality, partially-complete Lolley Mine because the value of the mine "as complete" will exceed the cost of completion.

13.    As set forth in more detail below, the proposed DIP financing is subject to certain terms and conditions including a "roll-up" of certain of the first lien lenders' prepetition loans which were incurred immediately before the commencement of these Cases. The Roll-Up Loans are a material component of the structure of the DIP Facility and were required by the DIP Lenders as a condition to their commitment to provide postpetition financing.

14.    The terms of the DIP financing also require that the Debtors meet certain milestones on set dates. The Debtors believe that these milestones will help drive their restructuring and potential sale process. The Debtors also believe that the milestones are achievable and, indeed, necessary to efficiently and effectively implement a successful restructuring through chapter 11.

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 12 of 32

15.     The DIP financing by RCF is a result of extensive negotiations and is the best and only financing available to the Debtors as they embark on a process to restructure in chapter 11. Absent the DIP Facility, the Debtors would not be able to complete any restructuring in chapter 11 to the detriment of all parties in interest. Thus, it is critical that the Debtors be able to access the DIP Facility as quickly as possible after the chapter 11 filing.

16.     For all of these reasons and the reasons more fully set forth in this motion, the Debtors believe that the relief requested herein presents a sound exercise of business judgment and should be approved.

### Concise Statement Pursuant to Bankruptcy Rule 4001

17.     The Debtors seek entry of the Interim Order, substantially in the form attached hereto as **Exhibit A,** and the Final Order substantially in the form attached hereto as **Exhibit B**[5] (together with the Interim Order, the "DIP Orders"): (i) authorizing the Debtors to obtain senior secured postpetition financing as set forth in in the DIP Credit Agreement, substantially in the form attached as **Exhibit C**, among Debtors Piney Woods and Jesse Creek, as Co-Borrowers, and the DIP Lenders; (ii) granting liens and providing superpriority claims with respect to such postpetition financing; (iii) authorizing the Debtors to use Cash Collateral; (iv) approving the consent of Resource Capital Fund V L.P. ("RCF V"), RCF V Annex Fund L.P. ("RCF Annex"), and Resource Capital Fund VI L.P. ("RCF VI" and together with RCF V and RCF Annex, the "Prepetition Lenders") in lieu of adequate protection; (v) modifying the automatic stay; (vi) scheduling a Final Hearing to consider entry of the Final Order; and (viii) granting related relief.

18.     The provisions of the DIP Documents and the Interim Order were extensively

---

[5]     RCF has reserved its right to submit comments to the form of Final Order attached as **Exhibit B**, which suggested changes, if any, will be submitted to the Court and interested parties not less than three (3) days prior to the hearing on the Final Order.

negotiated and are the most favorable terms that the Debtors were able to obtain. Moreover, the Debtors have an urgent need for the liquidity afforded by the DIP Facility. Approval of the DIP Facility will ensure the Debtors are able to pursue these chapter 11 cases and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors request that the Court enter the Interim Order and Final Order approving the DIP Facility.

19.     [Intentionally omitted.]

## Background

## I.     Debtors' Capital Structure

20.     As of the Commencement Date, the Debtors have approximately $100 million in total funded debt obligations, primarily from RCF, the Debtors' first lien lender ("First Lien Lender"). The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal Amount Outstanding ($mm) |
|---|---|
| Senior Secured Obligations to RCF<br>- Secured Convertible Note<br>- Secured Convertible Note<br>- Secured Convertible Note<br>- Bridge Loan | $3,000,000<br>$27,575,833<br>$20,000,000<br>$27,810,111 |
| Equipment Loans | $10,565,646 |
| RCF/Tacoa Unsecured Series A Loan | $7,592,868[6] |
| RCF/Tacoa Reimbursement Agreement (Bonding Obligations) | $2,600,000 |
| RCF Secured Reimbursement Agreement (Macquarie Lease Letter of Credit) | $5,000,000 |

---

[6]     The approximate principal amount of the RCF/Tacoa Unsecured Series A Note is comprised of (i) an Amended and Restated Unsecured Convertible Promissory Note issued to RCF in the principal amount of $2,700,000, (ii) an Amended and Restated Unsecured Convertible Promissory Note issued to Tacoa Minerals, LLC in the principal amount of $2,300,000, and (iii) capitalized interest accrued on both notes.

### A. RCF First Lien Loans.

21.    The Debtors entered into the following agreements with RCF (the "First Lien Loans"), which grant RCF a first priority secured lien on all of the Debtors' assets save for certain equipment subject to purchase money security interests and certain operating leases:

- Note Purchase Agreement dated as of May 27, 2016, as amended by Amendment No. 1 to Note Purchase Agreement dated as of September 8, 2017, Amendment No. 2 to Note Purchase Agreement dated as of November 10, 2017 and Omnibus Waiver, Consent and Amendment dated as of December 14, 2017 (the "Class B NPA"), and any note issued pursuant thereto (the "Class B Notes"), including the Amended and Restated Convertible Promissory Note dated September 8, 2017 from Jesse Creek and Piney Woods payable to the order of RCF VI in the principal amount of $27,575,833.33 and the Amended and Restated Convertible Promissory Note dated September 8, 2017 from Jesse Creek and Piney Woods payable to the order of RCF Annex in the principal amount of $3,000,000.00.

- Note Purchase Agreement dated as of November 10, 2017, as amended by Omnibus Waiver, Consent and Amendment dated as of December 14, 2017 (the "Class C NPA"), and any note issued pursuant thereto (the "Class C Notes"), including the Third Amended and Restated Convertible Promissory Note dated January 5, 2018 from Jesse Creek and Piney Woods payable to the order of RCF VI in the principal amount of $20,000,000.00.

- Bridge Loan dated as of March 22, 2018, as amended by (i) Amendment No. 1 to Bridge Loan dated February 8, 2019, (ii) Amendment No. 2 to Bridge Loan dated February 15, 2019, (iii) Amendment No. 3 to Bridge Loan dated February 25, 2019, and (iv) Amendment No. 4 to Bridge Loan dated March 8, 2019, and the Fourth Amendment and Restated Promissory Note issued pursuant thereto in the aggregate principal amount of up to $30,010,111.11, of which amount, $27,810,111.11 has been funded.

22.    The First Lien Loans bear interest at a rate of 10 percent interest per annum with the exception of the Bridge Loan which bears interest at a rate of 8 percent interest per annum. The First Lien Loans are secured by liens on substantially all of the Debtors' assets and are senior in priority to all other debt, except for certain purchase money security interests and operating leases.

23.    The Debtors used proceeds from the First Lien Loan to fund construction of the Lolley Mine, but given the unanticipated geologic problems encountered in the development of

the Lolley Mine, this funding was insufficient to complete the project.

**B.      Unsecured Series A Loan**

24.      The Debtors also entered into that Note Purchase Agreement dated as of November 17, 2014, as amended by Amendment No. 1 to Note Purchase Agreement dated November 16, 2018, and any notes issued pursuant thereto (the "Class A Notes"), including the Amended and Restated Unsecured Convertible Promissory Note dated November 16, 2018 from the Jesse Creek and Piney Woods payable to the order of RCF V in the principal amount of $2,700,000 and the Amended and Restated Unsecured Convertible Promissory Note dated November 16, 2018 from Jesse Creek and Piney Woods payable to the order of Tacoa Minerals, LLC in the principal amount of $2,300,000 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Unsecured Series A Loan").

25.      The Unsecured Series A Loan bears interest at a rate of 10 percent per annum.

**C.      Secured Reimbursement Agreement**

26.      The Debtors also entered into the following reimbursement agreement, which is secured by liens on substantially all of the Debtors' assets:

-      Reimbursement Agreement by and among Jesse Creek, as borrower, Piney Woods, as guarantor, and RCF VI as lender, dated as of March 22, 2018, and the Promissory Note for Reimbursement Agreement issued pursuant thereto in the principal amount of $5,000,000.00.

(as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Secured Reimbursement Agreement Loan").

27.      The Secured Reimbursement Agreement Loan bears interest at a rate of 10 percent per annum which is due only when letters of credit supported by RCF VI are drawn by certain equipment lessors.

**D. Unsecured Reimbursement Agreements**

28.     The Debtors also entered into the following reimbursement agreements:

- Reimbursement Agreement by and among Jesse Creek, as borrower, Piney Woods, as guarantor, and RCF V as lender, dated as of October 14, 2014, assigned from RCF V to RCF VI pursuant to that certain Assignment Agreement, effective as of November 20, 2015, and amended pursuant to (i) that certain Acknowledgement and Receipt of Request, dated as of June 27, 2017, and (ii) Amendment No. 2 to Reimbursement Agreement dated April 18, 2018.

- Reimbursement Agreement by and among Jesse Creek as borrower, Piney Woods as guarantor and Tacoa Minerals, LLC as lender, dated as of October 22, 2014, and amended pursuant to that certain Acknowledgement and Receipt of Request, dated as of June 26, 2017.

(as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Unsecured Reimbursement Agreement Loans").

29.     The Unsecured Reimbursement Agreement Loans each bear interest at a rate of 10 percent per annum which is due only when letters of credit are drawn.

**II.     Debtors' Need for Immediate Cash.**

30.     The Debtors require immediate access to liquidity to ensure that they are able to preserve the value of their estates for the benefit of all parties in interest. As of the Commencement Date, the Debtors' total cash balance was approximately $179,000. Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

31.     The Debtors reviewed and analyzed the Debtors' Budget outlining the Debtors' postpetition cash needs in the initial 8 weeks of these cases. The Debtors believe that the Budget and their projections provide an accurate reflection of their funding requirements over the

identified period, will allow them to meet their obligations—including the administrative expenses of the chapter 11 cases—and are reasonable and appropriate under the circumstances.

32.     The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases. The DIP Facility is critical to the Debtors' ability to smoothly operate postpetition, including by providing sufficient liquidity to fund the administrative cost of these chapter 11 cases and, importantly, payments to the Debtors' employees, who are crucial to preserving the Debtors' estate. As a result, the Debtors believe that the DIP Facility provides the Debtors with sufficient liquidity to provide the minimum funding necessary to preserve the assets and fund the administration of these chapter 11 cases. As such, the DIP Facility is essential to the Debtors' ability to prosecute these chapter 11 Cases during the pendency of these cases. *See* Spears Declaration ¶¶40–42.

33.     With insufficient cash on hand, the Debtors require interim approval of the DIP Facilities to obtain access to critical financing.

III.    **No Alternative Sources of Funding Available.**

34.     Absent the immediate relief requested by this motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases. The Debtors cannot administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. However, the Debtors do not have a variety of sources of financing readily available. The Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' long-term liquidity needs and projected cash losses, restricts the availability of, and options for, postpetition financing. As a result, the Debtors do not believe third-party debtor-in-possession financing would

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 18 of 32

be reasonably obtainable.

## Basis for Relief

I.  **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

   A.  **Entering into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

35.     The Court should authorize the Debtors, in the sound exercise of their business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Belle Foods, LLC*, No. 13-81963-JAC11, 2013 WL 5590876, at *5 (Bankr. N.D. Ala. Aug. 12, 2013) (approving debtor-in-possession loan where it "reflect[ed] the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 19 of 32

36.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

37.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. *In re ION Media Networks. Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

38.    The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arms'-length process and careful evaluation of alternatives. Specifically, and in the face of extremely limited cash on hand, the Debtors determined that a certain minimum level of postpetition financing is required to preserve the assets in the form that will provide the most value to the estates. The Debtors negotiated the DIP Credit Agreement and other DIP Documents with the DIP Lenders in good faith at arms' length, and the Debtors believe that they have obtained the best financing available. Accordingly, the Court should

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 20 of 32

authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

39.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code, and first liens on all unencumbered property.

40.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) without allowing a lender an administrative claim; (ii) the credit is necessary to preserve the estate assets; (iii) the terms of for the credit are fair, reasonable, and adequate, given the circumstances. *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

41.    As described above and as set forth in the Spears Declaration, the Debtors are in need of an immediate capital infusion, yet previous efforts to obtain other financing were not successful and all of the Debtors' existing assets are encumbered under their existing capital structure. *See* Spears Decl. ¶¶ 11, 43. Therefore, the Debtors, concluded that any workable financing for these Cases must be provided by the Debtors' existing lenders.

42.    Without postpetition financing, the Debtors lack sufficient funds to preserve their

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document       Page 21 of 32

assets or cover the projected costs of these chapter 11 cases. *See* Spears Decl. ¶¶ 40–46. Absent the DIP Facility, which will allow the Debtors to meet their working capital needs during these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

43.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate, as is providing liens on the Debtors' unencumbered property pursuant to the Final Order.

44.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 22 of 32

lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequately protected.

45.     Here, the First Lien Lenders have consented to the use of Cash Collateral, and the Prepetition Lenders will receive adequate protection pursuant to the DIP Documents. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

46.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 23 of 32

47.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure, in that all of the Debtors' assets are encumbered under their existing capital structure. *See* Spears Decl. ¶ 43. Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of a chapter 11 plan. *See* Spears Decl. ¶ 40–47. Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Repayment Feature ("Roll-Up") of the DIP Facility Under the Final Order Is Appropriate.**

48.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval. It is well settled in most circuits that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

49.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. Courts in many jurisdictions have approved similar DIP features on the first day of the case, and in amounts that far exceed the $300,000 in

Case 19-01390-DSC11     Doc 21     Filed 04/03/19     Entered 04/03/19 12:41:29     Desc Main
Document         Page 24 of 32

issue here. *See, e.g., In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP and a roll-up of approximately $250 million prepetition debt, including a full ABL roll-up of $215 million, pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included a full roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re BCBG Max Azria Global Holdings LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing a $157 million DIP and a roll-up of $117 million, including a full ABL roll-up of $82 million pursuant to final order following a creeping roll-up pursuant to the interim order); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018) (authorizing a $290 million DIP, including a full ABL roll-up of $190 million, pursuant to interim order); *In re Gymboree Corporation*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) (authorizing a $378 million DIP and $247 million roll-up, including a full ABL roll-up of $177 million); *In re Toys "R" US, Inc.*, No. 17-34665 (Bankr. E.D. Va. Sept. 20, 2017) (authorizing a $2.3 billion DIP and a full roll-up of

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document    Page 25 of 32

approximately $948 million in the prepetition ABL and FILO facilities).

50.     As set forth above, the DIP Credit Agreement provides that the $300,000 advanced in March 2019 will "roll up" with the DIP Facility. The roll-up of the Roll Up Loans, which were funded on the eve of and in contemplation of the commencement of these Cases, is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing. Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest. Given these circumstances, the roll-up of the Roll Up Loans is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

51.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party or if the Court otherwise authorizes such use. Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, and, subject to the stipulations, consents, and releases sought in the Interim and Final Orders, the Prepetition Secured Parties are consenting to the use of cash collateral without the need for Debtors to provide additional adequate protection.

52.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 26 of 32

case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

53.     As described more fully above, and as set forth in the Interim Order, in consideration of the milestones, stipulations, consents, and releases set forth in the Interim and Final Orders, the Prepetition Secured Parties consent to the Debtors' use of the Prepetition Collateral, the Carve-Out, and the priming liens and security interests granted to the DIP Lender in accordance with the terms of this Interim Order in lieu of requiring further adequate protection under the Bankruptcy Code.

54.     Therefore, the Debtors submit that the Prepetition Secured Parties' consent in lieu of additional adequate protection is sufficient to satisfy any applicable adequate protection requirements and is fair and appropriate under the circumstances of these cases to ensure that the Debtors are able to continue using the Cash Collateral and to move toward a sale of their assets.

## III.     The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).

55.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document      Page 27 of 32

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

56.     As explained in the Spears Declaration, the DIP Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the only terms on which to obtain vital postpetition financing. The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.     The Automatic Stay Should Be Modified on a Limited Basis.

57.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Financing Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement), the automatic stay shall be vacated and modified to the extent necessary to permit the

DIP Financing Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

58. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g., In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg*., LLC, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## V. Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

59. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

60. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive the right to draw $1,000,000 on an interim basis under the DIP Facility. The Debtors require those funds until the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and,

therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. *See* Spears Decl. ¶¶ 40–47.

**Request for Final Hearing**

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after April 27, 2019, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Reservation of Rights**

62.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the DIP Orders is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

4828-1419-4576

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

63. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

64. The Debtors will provide notice of this Motion to: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lenders under the Debtors' debtor-in-possession credit agreement and prepetition first-lien credit agreements; (d) all other secured lenders; (e) equipment and real property lessors; (f) the United States Attorney's Office for the Northern District of Alabama; (g) the United States Internal Revenue Service; (h) the Alabama Department of Revenue; (i) the United States Environmental Protection Agency; (j) the Alabama Surface Mining Commission; (k) the Alabama Department of Environmental Management; (l) the office of the attorneys general for the states in which the Debtors operate; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

65. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given

## No Prior Request

66. No prior request for the relief sought in this Motion has been made to this or any other court.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Birmingham, Alabama
Dated: __04/03/2019_____

/s/Lee R. Benton_____
Lee R. Benton
Samuel C. Stephens
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Phone    205.278.8000
Fax        205.278.8005
Email: lbenton@bcattys.com
            sstephens@bcattys.com

– and –

Mary Elisabeth Naumann (KY Bar # 88328)
(*Pro hac admission pending*)
Chacey R. Malhouitre (KY Bar # 91019)
(*Pro hac admission pending*)
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
Lexington, KY 40507
Telephone: (859) 255-9500
mnaumann@jacksonkelly.com
chacey.malhouitre@jacksonkelly.com

*Proposed Co-Counsel to the Debtors*

Case 19-01390-DSC11    Doc 21    Filed 04/03/19    Entered 04/03/19 12:41:29    Desc Main
Document    Page 32 of 32