| | |
|---|---|
| In re: | Chapter 11 |
| PINEY WOODS RESOURCES, INC., *et al.*,[1] | Case No. 19-01390-DSC11 |
| Debtors. | (Jointly Administered) |

## DECLARATION OF B. SCOTT SPEARS, CHIEF EXECUTIVE OFFICER OF PINEY WOODS RESOURCES, INC. AND JESSE CREEK MINING, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, B. Scott Spears, Chief Executive Officer of debtor Piney Woods Resources, Inc. ("Piney Woods"), the parent company of debtor Jesse Creek Mining, LLC ("Jesse Creek" and with Piney Woods, the "Debtors"), hereby declare under penalty of perjury:

### Qualifications

1. I am Chief Executive Officer of Piney Woods, which owns 100% of Jesse Creek. The principal business of Piney Woods is its ownership of Jesse Creek. Jesse Creek is engaged in the production and sale of metallurgical grade coal from a mining complex located in Shelby County, Alabama.

2. I am a graduate of the West Virginia University with a degree in accounting. I am formerly a CPA and have over 25 years of executive leadership, operational and financial management experience, principally in the coal mining industry, both public and private, including

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Piney Woods Resources, Inc. (0129) and Jesse Creek Mining, LLC (0533). The location of the Debtors' service address is: 1615 Kent Dairy Road, Alabaster, Alabama 35007. Debtors have filed a motion for joint administration with the Court.

1

4843-3775-5793

underground, surface, and highwall mining techniques with both metallurgical and thermal quality coals. Prior to coming to Jesse Creek, I held positions as the President and CFO of White Oak Resources, LLC, Vice President and Treasurer of Magnum Coal Company, Vice President and CFO of Trout Coal Holdings, and various accounting and management positions at Massey Energy Company and Titanium Metals Corporation. In my capacity as CEO of the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I have held the position of CEO since November of 2015. My responsibilities include oversight of feasibility analysis, operations, sales, accounting, human resources and strategic direction.

3. On the date hereof (the "Commencement Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Alabama (the "Court"). To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

4. I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful chapter 11 process for the Debtors, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference.

5. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and/or advisors, my review of relevant documents and information concerning the Debtors' operations,

financial affairs, and/or restructuring initiatives, and my opinions based upon my experience and knowledge.

6. I am over 18 years of age and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

7. To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Pleadings, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations and the circumstances leading to these chapter 11 cases;

- **Part II** provides an overview of the Debtors' prepetition capital structure and other liabilities;

- **Part III** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings, including the Debtors' proposed DIP financing.

## Part I

### Corporate History

8. Piney Woods and Jesse Creek were formed on June 29, 2012 to produce and develop coal assets and engage in the business of extracting, processing, and marketing metallurgical and industrial coals from underground, surface and highwall mining operations. Jesse Creek is headquartered in Alabaster, Alabama and, at the time of its founding, had operating assets that included one underground mine and one surface and highwall mining operation located approximately 7 miles west of Alabaster, Alabama. Through these two distinct active mining operations, Jesse Creek was able to access qualities of coal with high volatility, low sulfur and low ash characteristics, which allows the Debtors to develop relationships with a diverse customer base,

3

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main
Document      Page 3 of 17

both domestically and internationally. Jesse Creek's traditional customers include coke producers and industrial customers, and the company is uniquely positioned within the coal industry because of its primary focus on metallurgical,[2] rather than thermal coal.

9. In August 2014, Jesse Creek embarked on a study to determine whether the development of an adjacent coal basin known as the Lolley Basin would be feasible. During the period of August 2014 through February 2017, Jesse Creek completed a scoping study, pre-feasibility study and full bankable feasibility study in conjunction with its majority owner's technical departmental team.

10. Today, Jesse Creek consists of a mining complex that contains a surface and highwall mining operation ("Murry Creek"), a preparation plant ("PWR Processing"), and an underground mine development project ("Lolley Mine") as a result of the feasibility study. Jesse Creek has been developing the Lolley Mine, a brownfield underground metallurgical project with an expected mine life of approximately 25 years. At full productive capacity the production rate will be approximately 1.5 million tons per year. The Lolley Mine project is approximately 60% complete, but has cost more than expected due to a significant, unforeseen geologic zone that was encountered beginning in September 2018. Jesse Creek, therefore, had to change its mining technique to a method that is less productive while developing the mine access, known as a slope, into the main body of the coal reserves. The main body of the reserves are still believed to be viable once the mine access is complete.

11. As of the Commencement Date, the Debtors have spent approximately $56.6 million developing the Lolley Mine including upgrading PWR Processing to accommodate higher

---

[2] Metallurgical or "met coal" refers to the various grades of coal with suitable carbonation properties to make coke in the steelmaking process. This is in contrast to thermal coal, which is used to produce electricity, steam, or both.

4

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main
Document    Page 4 of 17

production levels. Although Jesse Creek previously targeted a total cost of development of approximately $60.0 million, the adverse mining conditions have forced the Debtors to revise the total cost of development to approximately $100 million, including the spending to date. In early December 2018, Jesse Creek engaged a third-party advisor to assist in raising outside capital. This advisor was unable to secure the necessary interest in the company, and by mid-February 2019 it became clear that this particular advisor was going to be unable to raise any investment interest to fund the completion of the Lolley Mine. All the while, the owners continued to fund the Lolley Mine development. Alternative capital raising efforts followed. The increased cost, coupled with the inability to raise third party capital and the owners' inability to fully fund the continued development has suddenly and severely limited the Debtors' liquidity and has prevented them from continuing to operate.

12. Piney Woods is owned approximately (a) 70.8% by private equity funds controlled by Resource Capital Funds ("RCF") and (b) 27.7% by Tacoa Minerals, LLC.[3] In addition to its equity investment, RCF has provided various tranches of senior secured debt to the Debtors to fund the Lolley Mine as well as supplemental expansions of a credit line to the Debtors to fund development. However, RCF funding ceased around March 20, 2019, and the Debtors were forced to idle mining and development operations on March 27, 2019. All but 28 critical staff were laid off at that time.

13. RCF has agreed to provide debtor in possession financing to fund a Chapter 11 sale of the Debtors' assets. RCF and the Debtors believe that one or more parties will be interested in acquiring the high quality, partially-complete Lolley Mine because the value of the mine "as complete" will exceed the cost of completion.

---

[3] The remaining shares are owned by current or former officers and directors pursuant to incentive stock programs.

5

4843-3775-5793

# Part II

# Corporate and Capital Structure

## I. The Debtors' Organizational Structure.

14. The Debtors' organizational structure is set forth in **Exhibit A**.

## II. Capital Structure

15. As of the Commencement Date, the Debtors have approximately $100 million in total funded debt obligations, primarily from RCF, the Debtors' first lien lender ("First Lien Lender"). The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal Amount Outstanding ($mm) |
|---|---|
| Three Senior Secured Obligations to RCF<br>- B Notes<br>- C Notes<br>- Bridge Loan | <br>$30,575,833<br>$20,000,000<br>$27,810,111.11 |
| Equipment Loans | $10,565,646 |
| RCF/Tacoa Unsecured Series A Loan | $7,592,868[4] |
| RCF/Tacoa Reimbursement Agreement (Bonding Obligations) | $2,600,000 |
| RCF Secured Reimbursement Agreement (Macquarie Lease Letter of Credit) | $5,000,000 |

---

[4] The approximate principal amount of the RCF/Tacoa Unsecured Series A Note is comprised of (i) an Amended and Restated Unsecured Convertible Promissory Note issued to RCF in the principal amount of $2,700,000, (ii) an Amended and Restated Unsecured Convertible Promissory Note issued to Tacoa Minerals, LLC in the principal amount of $2,300,000, and (iii) capitalized interest accrued on both notes.

6

4843-3775-5793

**A.     RCF First Lien Loans.**

16.     The Debtors entered into the following agreements with RCF (the "First Lien Loans"), which grant RCF a first priority secured lien on all of the Debtors' assets save for certain equipment subject to purchase money security interests and certain operating leases:

- Note Purchase Agreement dated as of May 27, 2016, as amended by Amendment No. 1 to Note Purchase Agreement dated as of September 8, 2017, Amendment No. 2 to Note Purchase Agreement dated as of November 10, 2017 and Omnibus Waiver, Consent and Amendment dated as of December 14, 2017 (the "Class B NPA"), and any note issued pursuant thereto (the "Class B Notes"), including the Amended and Restated Convertible Promissory Note dated September 8, 2017 from Jesse Creek and Piney Woods payable to the order of RCF VI in the principal amount of $27,575,833.33 and the Amended and Restated Convertible Promissory Note dated September 8, 2017 from Jesse Creek and Piney Woods payable to the order of RCF Annex in the principal amount of $3,000,000.00.

- Note Purchase Agreement dated as of November 10, 2017, as amended by Omnibus Waiver, Consent and Amendment dated as of December 14, 2017 (the "Class C NPA"), and any note issued pursuant thereto (the "Class C Notes"), including the Third Amended and Restated Convertible Promissory Note dated January 5, 2018 from Jesse Creek and Piney Woods payable to the order of RCF VI in the principal amount of $20,000,000.00.

- Bridge Loan dated as of March 22, 2018, as amended by (i) Amendment No. 1 to Bridge Loan dated February 8, 2019, (ii) Amendment No. 2 to Bridge Loan dated February 15, 2019, (iii) Amendment No. 3 to Bridge Loan dated February 25, 2019, and (iv) Amendment No. 4 to Bridge Loan dated March 8, 2019, and the Fourth Amendment and Restated Promissory Note issued pursuant thereto in the aggregate principal amount of up to $30,010,111.11, of which amount, $27,810,111.11 has been funded.

17.     The First Lien Loans bear interest at a rate of 10 percent interest per annum with the exception of the Bridge Loan which bears interest at a rate of 8 percent interest per annum. The First Lien Loans are secured by liens on substantially all of the Debtors' assets and are senior in priority to all other debt, except for certain purchase money security interests and operating leases.

7

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main
Document    Page 7 of 17

18. The Debtors used proceeds from the First Lien Loan to fund construction of the Lolley Mine, but this funding was insufficient to complete the project due to unanticipated adverse geology.

**B.  Unsecured Series A Loan**

19. The Debtors also entered into that Note Purchase Agreement dated as of November 17, 2014, as amended by Amendment No. 1 to Note Purchase Agreement dated November 16, 2018, and any note issued pursuant thereto (the "Class A Notes"), including the Amended and Restated Unsecured Convertible Promissory Note dated November 16, 2018 from the Jesse Creek and Piney Woods payable to the order of RCF V in the principal amount of $2,700,000 and the Amended and Restated Unsecured Convertible Promissory Note dated November 16, 2018 from Jesse Creek and Piney Woods payable to the order of Tacoa Minerals, LLC in the principal amount of $2,300,000 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Unsecured Series A Loan").

20. The Unsecured Series A Loan bears interest at a rate of 10 percent per annum.

**C.  Secured Reimbursement Agreement**

21. The Debtors also entered into the following reimbursement agreement, which is secured by liens on substantially all of the Debtors' assets:

- Reimbursement Agreement by and among Jesse Creek, as borrower, Piney Woods, as guarantor, and RCF VI as lender, dated as of March 22, 2018, and the Promissory Note for Reimbursement Agreement issued pursuant thereto in the principal amount of $5,000,000.00.

(as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Secured Reimbursement Agreement Loan").

22. The Secured Reimbursement Agreement Loan bears interest at a rate of 10 percent per annum which is due only when letters of credit are drawn.

**D. Unsecured Reimbursement Agreements**

23. The Debtors also entered into the following reimbursement agreements:

- Reimbursement Agreement by and among Jesse Creek, as borrower, Piney Woods, as guarantor, and RCF V as lender, dated as of October 14, 2014, assigned from RCF V to RCF VI pursuant to that certain Assignment Agreement, effective as of November 20, 2015, and amended pursuant to (i) that certain Acknowledgement and Receipt of Request, dated as of June 27, 2017, and (ii) Amendment No. 2 to Reimbursement Agreement dated April 18, 2018.

- Reimbursement Agreement by and among Jesse Creek as borrower, Piney Woods as guarantor and Tacoa Minerals, LLC as lender, dated as of October 22, 2014, and amended pursuant to that certain Acknowledgement and Receipt of Request, dated as of June 26, 2017.

(as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Unsecured Reimbursement Agreement Loans").

24. The Unsecured Reimbursement Agreement Loans bears interest at a rate of 10 percent per annum which is due only when letters of credit are drawn.

**III. Additional Obligations.**

**A. Employee Benefit Obligations.**

25. The Debtors sponsor a 401(k) Plan to qualified full-time employees to assist in providing for retirement. The 401(k) Plan offers retirement benefits to employees, and the Debtors make matching contributions to the 401(k) Plan based on the respective employee's participation in the plan.

**B. Workers' Compensation and Black Lung Act Obligations.**

26. As required by federal and state law, the Debtors provide benefits to employees for awards related to workers' compensation and pneumoconiosis (more commonly known as black lung disease). Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which

then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "Black Lung Act Claims").

27. Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund"). If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant. In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral or to obtain insurance for its payment obligations. A coal operator's directors and officers may also be held personally liable for unpaid benefits.

28. The Debtors are insured for federal and state workers' compensation and black lung benefits for employees by a third-party insurance provider.

**C.     Asset Retirement Obligations.**

29. Like other coal companies, the Debtors have asset retirement obligations that are related to mine reclamation and closure costs. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act as well as certain state laws.

30. The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both their surface and underground mines in accordance with applicable reclamation laws in the United States, as defined by each mining

10

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main
Document      Page 10 of 17

permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate. The Debtors' asset retirement obligations as of February 28, 2019 were approximately $1.9 million, including amounts classified as a current liability, of which $10,448,890 in outstanding surety bonds are secured by $2,600,000 in aggregate collateral.

**Part III**

**Evidentiary Support for First Day Pleadings**

**A.     First Day Pleadings.**

31.     Contemporaneously with this Declaration, the Debtors have sought relief through a number of First Day Pleadings that they believe are necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.

32.     These First Day Pleadings seek authority to, among other things, honor employee-related wages and benefit obligations and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Pleadings is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

33.     Several of these pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm . . ." In light of this requirement, the Debtors have narrowly

11

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main Document    Page 11 of 17

tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

34. I am familiar with the contents and substance of each First Day Pleading (including the exhibits thereto), and the statements and facts set forth in each of the First Day Pleadings are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity to maximize value in these chapter 11 cases; and (c) best serves the interests of the Debtors' stakeholders.

**B.   Proposed DIP Financing.**

35. In preparation for this chapter 11 filing, the Debtors initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternative sources of capital from parties outside the Debtors' existing capital structure.

36. All of the lenders contacted were ultimately unwilling to provide debtor-in-possession financing because, among other things, the Debtors' recent financial performance had deteriorated, and the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets, leaving no unencumbered collateral available to be pledged to a third-party lender. Additionally, these potential lenders were not willing to pursue a nonconsensual priming DIP against the Prepetition Secured Parties.

37. Absent postpetition financing, the Debtors would be unable to continue to operate. Accordingly, the Debtors endeavored to negotiate acceptable debtor-in-possession financing terms with the First Lien Lender.

12

4843-3775-5793

Case 19-01390-DSC11    Doc 22    Filed 04/03/19    Entered 04/03/19 12:56:13    Desc Main
Document    Page 12 of 17

38.     As of the filing of this declaration, the Debtors continue to negotiate certain open items with respect to the proposed DIP facility. The Debtors hope and expect to finalize the terms of a proposed postpetition financing facility with the First Lien Lender. If an agreement is reached, the debtor-in-possession financing is anticipated to provide approximately $2.58 million in new money funding, subject to certain terms and conditions including a "roll-up" of the First Lien Lender's prepetition claims and required milestones related to a marketing and sale process. The Debtors will continue to negotiate these open issues in advance of the hearing on their First Day Pleadings.

39.     The Debtors will seek entry of interim and final orders, a debtor in possession financing facility, consensual use of cash collateral, and provision of adequate protection to the Prepetition Secured Parties. As of the Commencement Date, the Debtors have an immediate need to access liquidity, and absent postpetition financing, will not be able to continue operations.

**C.     The Debtors' Immediate Liquidity Needs.**

40.     The Debtors are in need of an immediate capital infusion. The Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due. As of the Petition Date, the Debtors' total cash balance is approximately $179,000, and they do not have readily available sources of additional financing, other than the potential proposed postpetition financing the Debtors continue to negotiate with their First Lien Lender.

41.     As part of our evaluation of the Debtors' liquidity position, I reviewed, analyzed and assisted in the development of the Debtors' 8-week cash flow forecast, and reviewed and analyzed the Debtors' long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees and interest

expenses associated with the proposed DIP facility, professional fees, and required operational payments.

42. Further, absent funds available from the proposed DIP facility and the cooperation of key business partners at this critical early stage, the Debtors could lose support from important stakeholders on whom the Debtors' business depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates through a Chapter 11 sale.

43. A significant portion of the Debtors' assets include assets on which the Prepetition Secured Parties have liens. With operations in an idle stage, no cash is being generated from operations. The Debtors will need this cash to satisfy payroll, pay suppliers, meet overhead, pay expenses, and make any other payments that are essential for the continued management and preservation of the Debtors' business.

44. The Debtors, with the assistance of their advisors and through negotiations with the proposed DIP lenders, developed proposed DIP financing to be provided by their First Lien Lender. I believe that the proposed DIP financing establishes that the Debtors will have adequate liquidity during this period if allowed to utilize the cash collateral and access the proposed DIP facility.

45. Failure to obtain access to the proposed DIP facility would result in immediate and irreparable harm to the Debtors and their stakeholders and would diminish the value of the Debtors' estates. Without the approval of the proposed DIP facility and use of the cash collateral, the Debtors will be unable to preserve and maximize the value of their assets for the benefit of all parties in interest.

46. Accordingly, based on the foregoing, I respectfully submit that the Court should approve immediate access to the proposed DIP facility and the cash collateral.

**D.     Need for Interim Relief.**

47.     The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to vendors and employees. As such, and due to their current lack of liquidity, the Debtors require immediate access to postpetition financing and the use of cash collateral to preserve value and to avoid irreparable harm pending the Final Hearing. Absent funds available from the proposed DIP facility and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their business, lose support from important stakeholders on whom the Debtors' business depends, and face a major hindrance to their ability to maximize the value of their estates.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: April 2ND, 2019
ALABASTER, Alabama

_____
Name: B. Scott Spears
Title: Chief Executive Officer

4843-3775-5793

# Exhibit A

## Organizational Structure

4843-3775-5793